# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| LORENA M. CARPENTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 3:12-cv-01059 |
| v. | ) | Judge Nixon / Knowles |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain

judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff

was not disabled and denying Plaintiff Disability Insurance Benefits ("DIB") and Supplemental

Security Income ("SSI"), as provided under the Social Security Act ("the Act"), as amended.

The case is currently pending on Plaintiff's Motion for Judgment on the Administrative Record.

Docket No. 14. Defendant has filed a Response, arguing that the decision of the Commissioner

was supported by substantial evidence and should be affirmed. Docket No. 19.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for

Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February
14, 2013. Pursuant to Fed. R. Civ. P. 25(d), Carolyn W. Colvin should therefore be substituted
for Commissioner Michael J. Astrue as the Defendant in this action. No further action needs to
be taken to continue this suit by reason of the last sentence of section 205(g) of the Social
Security Act, 42 U.S.C. § 405(g).

1

be AFFIRMED.

# I.  INTRODUCTION

Plaintiff filed her applications for DIB and SSI on August 10, 2009, alleging that she had been disabled since April 24, 2009, due to "trouble focusing and concentrating," depression, back pain, headaches, "night leg pains," "overweight," chest pains, and ulcer.  Docket No. 12, Attachment ("TR"), TR 117, 120, 150.  Plaintiff's applications were denied both initially (TR 59, 60) and upon reconsideration (TR 61, 62).  Plaintiff subsequently requested (TR 80) and received (TR 82) a hearing.  Plaintiff's hearing was conducted on July 12, 2011, by Administrative Law Judge ("ALJ") Donald Garrison.  TR 26.  Plaintiff and vocational expert ("VE"), Lisa Courtney, appeared and testified.  *Id.*

On July 22, 2011, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations.  TR 11-21.  Specifically, the ALJ made the following findings of fact:

> 1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.
>
> 2.  The claimant has not engaged in substantial gainful activity since the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> 3.  The claimant has the following severe impairment [*sic*]: lumbar degenerative disc disease, obesity and depressive disorder, N.O.S (20 CFR 404.1520(c) and 416.920(c)).
>
> 4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> 5.  After consideration of the entire record, the Administrative

2

Law Judge finds that the claimant has the residual functional capacity to perform sedentary work limited as follows: to lift and carry 10 pounds; with the option to stand, walk and sit at will; and occasional ability to climb, balance, stoop, crouch, kneel and crawl. Additionally, the claimant is able to understand, remember and carry out short and simple instructions; make judgments on simple work-related decisions; and have occasional contact with the public.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was 45 years old at the alleged onset date, described as a younger individual (20 CFR 404.1563 and 416.963).

8. The claimant has a ninth grade education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 24, 2009, through the date of this decision (20 CFR 404.1520(g) and 416.920(g).

TR 13-21.

On September 23, 2011, Plaintiff timely filed a request for review of the hearing decision. TR 110-16. On August 21, 2012, the Appeals Council issued a letter declining to review the case (TR 1-3), thereby rendering the decision of the ALJ the final decision of the

3

Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

## II. REVIEW OF THE RECORD

The parties and the ALJ have thoroughly summarized and discussed the medical and testimonial evidence of Record. Accordingly, the Court will discuss those matters only to the extent necessary to analyze the parties' arguments.

## III. CONCLUSIONS OF LAW

### A. Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler,*

4

745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). If the Commissioner did not consider the record as a whole, however, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson*, 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

## B. Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied. 42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step

sequential evaluation process as follows:

(1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

(2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

(3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[2] or its equivalent.  If a listing is met or equaled, benefits are owing without further inquiry.

(4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5)  Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added).  *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule.

---

[2] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

6

Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.* In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

### C.  Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ: (1) improperly evaluated her credibility and minimized her physical and mental conditions, (2) did not accord proper weight to the medical opinions of her treating sources, (3) did not consider all of her severe impairments, (4) did not consider the entirety of the medical evidence when making his Residual Functional Capacity determination, and (5) failed to resolve inconsistencies between the Vocational Expert's testimony and the Dictionary of Occupational Titles. Docket No. 14-1. Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed, or in the alternative, remanded. *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

7

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994).

**1. Credibility of Plaintiff's Subjective Complaints and Conditions**

Plaintiff argues that the ALJ did not adequately evaluate her credibility because he made a conclusory statement that he had considered the relevant credibility factors, but such a conclusory statement is legally insufficient to comply with SSR 96-7P. Docket No. 14-1 at 9-11. Plaintiff also argues that the ALJ improperly discounted her credibility because she is able to perform some activities of daily living. *Id.* Plaintiff contends that her ability to perform some daily activities on a minimal basis is not inconsistent with her disability claim. *Id.* Plaintiff further contends that in evaluating her subjective complaints, the ALJ did not articulate the weight he accorded to her testimony or the reasons therefor. *Id.* Plaintiff submits that the ALJ is required to discuss the reasoning behind his credibility determination under SSR 96-7p, and that failure to do so constitutes reversible error. *Id.*

Defendant responds that the ALJ properly considered the inconsistencies between Plaintiff's reported daily activities and her claims of disability and the evidence of record, found her subjective complaints to be less than fully credible, and articulated the specific reasons for

that finding. Docket No. 19 at 8-12. Defendant further contends that the ALJ's credibility determination was supported by substantial evidence. *Id.*

The Sixth Circuit has set forth the following criteria for assessing a plaintiff's subjective complaints:

> [S]ubjective allegations of disabling symptoms, including pain, cannot alone support a finding of disability...[T]here must be evidence of an underlying medical condition *and* (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition *or* (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

*Duncan v. Secretary*, 801 F.2d 847, 853 (6th Cir. 1986) (*quoting* S. Rep. No. 466, 98th Cong., 2d Sess. 24) (Emphasis added); *see also* 20 C.F.R. §§ 404.1529, 416.929 ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled...."); and *Moon v. Sullivan*, 923 F.2d 1175, 1182-83 ("[T]hough Moon alleges fully disabling and debilitating symptomology, the ALJ, may distrust a claimant's allegations...if the subjective allegations, the ALJ's personal observations, and the objective medical evidence contradict each other."). Moreover, "allegations of pain...do not constitute a disability unless the pain is of such a debilitating degree that it prevents an individual from engaging in substantial gainful activity." *Bradley v. Secretary*, 862 F.2d 1224, 1227 (6th Cir. 1988).

When analyzing a claimant's subjective complaints, the ALJ must also consider the following factors and how they relate to the medical and other evidence in the record: the claimant's daily activities; the location, duration, frequency and intensity of claimant's pain; the precipitating and aggravating factors; the type, dosage and effect of medication; and the other treatment or measures to relieve pain. *See Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994)

(*construing* 20 C.F.R. § 404.1529(c)(2)).  After evaluating these factors in conjunction with the evidence in the record, and by making personal observations of the claimant at the hearing, an ALJ may determine that a claimant's subjective complaints of pain and other disabling symptoms are not credible.  *See, e.g., Walters v. Commissioner,* 127 F.3d 525, 531 (6th Cir. 1997); *Blacha v. Secretary*, 927 F.2d 228, 230 (6th Cir. 1990); and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981).

In the case at bar, the ALJ stated that he found Plaintiff to be "not entirely credible regarding the severity of her impairments."  TR 19.  In making this finding, the ALJ discussed Plaintiff's alleged ailments, daily activities, and medical records.  TR 14-19.  Regarding Plaintiff's subjective complaints and her daily activities, the ALJ stated:

> The claimant testified at the hearing that she can read and write and has no health insurance.  She stands 65 inches tall and weighs 258 pounds.  She stated the reason she cannot work is because she is depressed, has trouble coping, is overwhelmed and her mind is foggy a lot.  She cries all the time, her mind races and she has to write everything down.  She takes only "weak" medication because she lives with and cares for her aunt and uncle.  (Her uncle has use of only one hand and is basically bed-ridden.  Her aunt walks and can do some things).  Her back also hurts "really bad" and she rated her pain as an 8 on a 0-10 pain scale, but said her pain eases up if she sits down.  She also stated her blood pressure goes up and down, which may be due to her weight.  Her left leg goes numb when she sits on the toilet and she has swelling all over.  She has to lie down for an hour at different times throughout the day.  The claimant further testified her back felt okay during the hearing, but if she got up she knew it would hurt.  She takes Naproxyn for her back pain.  Regarding activities, the claimant grocery shops, microwaves food, does some housework and a little laundry, washes dishes and makes sure everything is okay.  She also attends church every Sunday, goes to Sunday School at times, and sometimes goes to dinner and breakfast at church.  The claimant further testified her doctor told her not to lift over 10 pounds, but she carries groceries, can stand 30 minutes, and sit 15-30 minutes.

10

Prior to evaluating the medical evidence, the claimant's statements in the function report at exhibit 4E should be discussed. The claimant stated that since she had lost her job, she spent her time getting back into her church. She sometimes took care of an elderly lady, cleaned her home, did the laundry and "hung out." She had no problems taking care of her personal needs, and used the microwave to cook daily, because she had no stove. She drove alone, shopped once a month, regularly attend [*sic*] church, watched television and liked to read. She also stated she did all chores, albeit with resting and sitting down, and mowed the lawn, stating that if she could get her 19 year-old daughter to do anything, it would be helpful. The claimant could count change but did not pay bills or use a checkbook/money orders because she had no money. She also admitted she followed written instructions okay and got along with authority figures okay; but could not follow spoken instructions, was severely stressed because she lost her job and could not handle a lot of distractions at one time.

TR 15, *citing* TR 156-65, *referencing* TR 26-50.

While Plaintiff argues that the fact that she can "perform some activity on a very minimal basis" (Docket No. 14-1 at 11) does not detract from the credibility of her claim, the ALJ can (and did) appropriately consider Plaintiff's engagement in activities, including caring for her aunt and uncle, doing household chores, and taking care of her personal needs, when considering the evidence in its entirety and reaching a credibility determination.

Contrary to Plaintiff's assertion that the "ALJ ignored the medical evidence, which shows the Plaintiff is disabled" (*id.*), the ALJ discussed the medical evidence regarding Plaintiff's physical impairments as follows:

The medical evidence was brief at best and certainly not indicative of disability. In January 2008, the claimant underwent a medical examination, in which she qualified for a commercial driver's license. It was significant that she denied experiencing almost any physical symptom [*sic*] whatsoever at that time. Specifically, she denied any muscular disease, spinal injury or disease, chronic low back pain, or any hand, upper or lower extremity, foot, finger or toe impairment. She also indicated no digestive problems, sleep

11

disorders, or any nervousness or psychiatric problems, including severe depression. Although she did report shortness of breath, she simultaneously denied any lung disease, asthma, or chronic bronchitis. Exhibit 1F.

There was no further medical evidence for any physical complaints until March 2010 when the claimant presented to the emergency room, and was described as an individual with no past medical history. Her complaints (at that time) included a four-week history of left-sided chest pain radiating down the left upper extremity that occasionally extended to the left side of the neck. She also reported shortness of breath with exertion for two years; and some tingling in the left lower limb when sitting on the toilet for prolonged periods, associated with a pulsation into the left groin area. She did, however, deny any constant pain, cough, pleurtic [*sic*] pain, fever, chills, nausea, vomiting or trauma. She took no medications. A comprehensive ten-point review of systems was noted as negative. The claimant was described as a well-developed, well-nourished, obese individual who was sitting comfortably. Her blood pressure was read as 161/69 and she was oxygenating at 98 percent on room air. On examination, her neck was supple, with no carotid brutis; while all lung fields were clear. Heart rate was regular and rhythmic, absent murmur, thrills or rubs. The abdomen was soft, non-tender, non-distended and with good bowel sound. Full range of motion was found in all four extremities that were absent any weakness, rashes or edema. An electrocardiogram revealed a normal sinus rhythm, with no ST elevation, depression or T-wave inversion; while chest x-ray showed no evidence of any acute cardiopulmonary process. Subsequently, emergency room physician, Mark T. Byram, M.D., stated the claimant's vital signs were stable and recommended the claimant take aspirin. Exhibit 9F.

The only other evidence were x-rays of the lumbar spine and the chest performed in March 2011. The lumbar spinal films revealed straightening of the normal lordotic curvature, with minimal anterior listhesis of L4-5 and minimal retrolosthesis at L3-4; mild to moderate multi-level degenerative disc change, consisting of various degrees of disc height loss, osteophytes and arthritic facet changes, most prominent at L5-S1, followed by L4-5. However, there was no destructive bony process and the pedicles were intact. Chest x-ray was even more unimpressive as soft tissues, bony thorax, cardiac silhouette, pulmonary parenchyma and mediastinal structures were all normal. Of note, both radiographic films also

12

showed evidence of a previous cholecystectomy. Exhibit 11F.

. . .

The claimant ambulated with a normal gait during a consultative examination performed by S. Mark Watson, M.D., in September 2009. She stood 65 inches tall and weighed 248 pounds. The claimant was described as pleasant, cooperative, obese, alert, fully oriented and in no acute distress. On examination, her pupils were round, equal and responsive to light and accommodation. The bilateral lung fields were clear to ausculation, while heart rate was regular and rhythmic, without murmurs. The neck was supple and free of lymphadenopathy. The abdomen was obese, soft and non-tender with normal bowel sounds. Full range of motion was obtained in the lumbar and cervical spines, bilateral shoulders, elbows, wrists, hands, hips, knees and ankles. Bilateral straight leg raise was negative and there was no cyanosis, clubbing or edema present in any extremity. Deep tendon and posterior tibial reflexes were two-plus and equal. The claimant was also neurologically intact, as strength, sensation, and coordination were found normal. An x-ray of the lumbar spine showed lumbar kyphosis, moderate degenerative changes throughout, and disc space narrowing at L1-2 and L3-4. Dr. Watson determined the claimant could lift and/or carry 10 pounds; stand and/or walk at least two hours in an eight-hour workday with normal breaks; and sit approximately six hours in an eight-hour workday with normal breaks. Exhibit 2F.

TR 15-16 *citing* TR 218-23, 224-31, 266-72, 276-77.

The ALJ also discussed the medical records regarding Plaintiff's mental health as

follows:

Equally as brief were the claimant's mental health records, as she began mental health therapy with the Mental Health Cooperative in November 2010. She stated she had been suffering from depression since childhood and relayed a history of mental health therapy, on and off, between 1999 and 2006, but denied any history of suicide ideation or suicide attempts. The claimant spent her time taking care of her sick aunt and uncle. She endorsed sadness, hopelessness, loneliness, anxiousness, crying spells, decreased sleep, increased appetite, lack of concentration, low energy level, and an inability to remember things. She also admitted to a history of marijuana and cocaine use in 1999 and an

13

arrest for domestic assault, spending five days in jail and paying for anger management. The claimant felt that some of her depression was related to her living situation, unemployment and self-worth issues. The following month, the claimant reported doing okay to the nurse practitioner. She indicated she had injured herself while caring for her uncle and had an appointment with the Matthew Walker Clinic for a physical. She was very polite and had no other concerns. However, during a medication management session later that same day, the claimant stated she could not focus or concentrate on tasks for more than 10 minutes at a time. She had to write notes to stay focused and stated frequent distraction had cost her her job. She was also concerned about her 20 year-old daughter who was homeless. She was prescribed Cymbalta. The claimant presented as tearful; upon return in January 2011, the claimant stated she could not tolerate Cymbalta, as is caused disorientation and "tenseness." Consequently, she stopped taking this medication. She reported stress related to her caregiver role. Support and encouragement were provided and she was prescribed Citalopram. Again, the claimant reported (that same day) to the nurse practitioner that she was doing okay. She was also appropriately dressed and appeared to have good hygiene. By February 2011, the claimant was taking medication as prescribed without side effects. Her affect was brighter, but she continued to report a depressed mood. Sleep was still reduced, but improved. Review of records throughout treatment essentially showed this same trend; specifically, of an individual who was stressed because of her living conditions, but one who experienced a decrease of symptoms, when taking medications as prescribed, with no side effects. Exhibit 13F.

. . .

Thomas L. Pettigrew, Ed.D., performed a psychological evaluation of the claimant in October 2009. The claimant presented as an obese, but otherwise physically well-developed individual, who was clean, well-groomed and appropriately dressed. She indicated she had been fired from her job as a dump truck driver because she had left the fueling station with the fuel hose still in the truck's fuel tank, and this was her third accident. She endorsed "severe" depression, which she had suffered for many years. Information gleaned from the function report (exhibit 4E above), also indicated that the claimant "suffered" with bashfulness as a child, depression as a teenager, manic depressive disorder, severe stress disorder, postpartum depression, and problems with her daughter that led to

14

a diagnosis of bipolar disorder (six years ago). The claimant was currently residing with her daughter and an elderly friend she took care of. Regarding activities of dialing [*sic*] living, the claimant reported that she did the following: independently bathed, dressed, groomed and drove. She also cleaned, cooked, did the laundry, shopped, watched television, read the newspaper, and regularly attended church. She also transported her friend to medical appointments and other destinations (not specifically indicated). The claimant was described as alert and fully oriented. She spoke with fairly articulated, fluent speech that was of a normal rate and tone, without pressure, flight of ideas, grandiosity or tangentiality. In fact, near-average vocabulary and syntax skills were noted. When questioned concerning her mood, the claimant responded that she was all right. She denied any suicidal thoughts or impulses. Her affect was mildly dysphoric and she exhibited some excitability associated with intermittent, transient crying. However, the examiner was not impressed by any signs of mania or agitation. When asked if she was able to get along with others, the claimant responded, "Yeah, I have no problems with other people except my daughter. She is bipolar." On testing, the claimant solved mental calculations quickly and accurately; while she demonstrated good comprehension and fund of information. Her recent and remote memory appeared intact. The claimant was estimated to be functioning within the low average range of intelligence, although the examiner opined the claimant's potential might be fully average. After this unimpressive evaluation, Dr. Pettigrew stated there was no evidence of any cognitive impairment. This examiner also said the claimant demonstrated the ability to understand, remember and carry out simple, verbal instructions; demonstrated effective receptive and expressive language skills; and appeared capable of establishing and maintain [*sic*] stable and reciprocal relationships with others. There was an estimated mild-to-moderate impairment in the ability to cope effectively with work pressures and demands. However, even with occasional tearfulness, the claimant was able to sustain concentration/persistence, tolerate and complete evaluation requirements. Exhibit 4F.

TR 17-19, *citing* TR 241-45, 279-302.

As can be seen, the ALJ's decision specifically addresses in detail not only Plaintiff's daily activities, but also Plaintiff's subjective claims and medical records. *Id*. The ALJ, when

15

evaluating the entirety of the evidence, is entitled to weigh the objective medical evidence against Plaintiff's subjective claims and reach a credibility determination. *See, e.g., Walters,* 127 F.3d at 531; and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981). An ALJ's findings regarding a claimant's credibility are to be accorded great weight and deference, particularly because the ALJ is charged with the duty of observing the claimant's demeanor and credibility. *Walters,* 127 F.3d at 531 (*citing Villarreal v. Secretary,* 818 F.2d 461, 463 (6th Cir. 1987)). Discounting credibility is appropriate when the ALJ finds contradictions among the medical reports, the claimant's testimony, the claimant's daily activities, and other evidence. *See Walters,* 127 F.3d at 531 (*citing Bradley,* 682 F.2d at 1227; *cf King v. Heckler,* 742 F.2d 968, 974-75 (6th Cir. 1984); and *Siterlet v. Secretary,* 823 F.2d 918, 921 (6th Cir. 1987)). If the ALJ rejects a claimant's testimony as not credible, however, the ALJ must clearly state the reasons for discounting a claimant's testimony (*see Felisky,* 35 F.3d at 1036), and the reasons must be supported by the record (*see King,* 742 F.2d at 975).

After assessing the evidence in its entirety, the ALJ determined that:

> . . . [T]he claimant is simply not entirely credible regarding the severity of her impairments. Deference is given to the claimant, in that she has no health insurance. However, is [*sic*] reasonable to assume that if she is in as much pain as she testified to, she would have sought treatment from an emergency room that typically accepts patients with no or subsidized cost at least occasionally. Additionally, she only takes anti-inflammatory medication for her symptoms of pain. Furthermore, none of her impairments prevents her from caring for her ill aunt and uncle, regularly attending church or the wide range of activities she admitted she can do, to include mowing the lawn. The claimant is not persuasive to the extent alleged.

TR 19.

The ALJ observed Plaintiff during her hearing, assessed the medical records, reached a

16

reasoned decision, and articulated the basis for that decision; the ALJ's findings are supported by substantial evidence and the decision not to accord full credibility to Plaintiff's allegations was proper. Therefore, this claim fails.

## 2. Weight Accorded to Medical Source Statements

Plaintiff maintains that the ALJ erred in discounting Nurse Angela Jackson's April 4, 2011, Medical Source Statement ("MSS"). Docket No. 14-1 at 7-8. Plaintiff argues that this MSS indicated that Plaintiff could not perform certain job duties, including "standing, walking, pushing and pulling for any continuous time frame," which would indicate a residual functional capacity of less than sedentary work. *Id.* at 7. Plaintiff contends that Nurse Jackson's MSS should have been accorded great weight. *Id.* Plaintiff also suggests that the ALJ did not appropriately weigh a MSS completed by Nurse Carrie Brensike, regarding Plaintiff's mental impairments. *Id.* at 12. Plaintiff argues that the ALJ's discounting of these MSSs improperly minimized the severity of her impairments.

Defendant responds that the ALJ properly evaluated the medical opinion evidence of record. Docket No. 19 at 12-14. Specifically, Defendant responds that the ALJ discussed the MSSs at issue and provided valid reasons for the weight accorded to them; Defendant argues that the ALJ's expressed reasons are supported by substantial evidence. *Id.* Defendant further argues that the ALJ properly accorded little weight to the opinions that were inconsistent with other evidence, and properly accorded greater weight to the opinions that were consistent with other evidence. *Id.* Defendant also notes that the "law limits the ALJ's duty to articulate the consideration of an opinion from a nurse practitioner," because, although considered "other sources," nurse practitioners are not "acceptable medical sources" who are "qualified to offer a

17

medical opinion," as defined by the SSA.  *Id., citing* SSR 06-3p, 2006 WL 2329939, at *2.

With regard to the evaluation of medical evidence, the Code of Federal Regulations states:

> Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> (1)  Examining relationship.  Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>
> (2) Treatment relationship.  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques *and is not inconsistent with the other substantial evidence in your case record*, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(I) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. . . .
>
> (3) Supportability.  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion. . . .
>
> (4) Consistency.  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization.  We generally give more weight to the
opinion of a specialist about medical issues related to his or her
area of specialty than to the opinion of a source who is not a
specialist.

. . .

20 C.F.R. § 416.927(d) (emphasis added).  *See also* 20 C.F.R. § 404.1527(d).

The ALJ must articulate the reasons underlying his decision to give the opinion of an

acceptable medical source a specific amount of weight.[3]  *See, e.g.,* 20 C.F.R. § 404.1527(d);

*Allen v. Commissioner*, 561 F.3d 646 (6th Cir. 2009); *Wilson v. Commissioner*, 378 F.3d 541, 544

(6th Cir. 2004).  If the ALJ rejects the opinion of a treating source, he is required to articulate

some basis for rejecting the opinion.  *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).  The

Code of Federal Regulations defines a "treating source" as:

[Y]our own physician, psychologist, or other acceptable medical
source who provides you or has provided you, with medical
treatment or evaluation and who has, or has had, an ongoing
treatment relationship with you.

20 C.F.R. § 404.1502.

With regard to nurse practitioners, who are not "acceptable medical sources" as defined

by the SSA, the Regulations provide that the ALJ may nevertheless properly

use evidence from other sources to show the severity of your
impairment(s) and how it affects your ability to work.  Other
sources include, but are not limited to -

---

[3] There are circumstances when an ALJ's failure to articulate good reasons for the weight
accorded to medical opinions may constitute harmless error: (1) if a treating source opinion is so
patently deficient that the ALJ could not possibly credit it; (2) if the ALJ adopts the opinion or
makes findings consistent with the opinion; and/or (3) if the ALJ has complied with the goal of
20 C.F.R. §1527(d), by analyzing the physician's contradictory opinions or by analyzing other
opinions of record.  *See, e.g., Friend v. Commissioner*, 375 Fed. Appx. 543, 551 (6th Cir. April
28, 2010); *Nelson v. Commissioner*, 195 Fed. Appx. 462, 470-72 (6th Cir. 2006); *Hall v.
Commissioner*, 148 Fed. Appx. 456, 464 (6th Cir. 2006).

(1) Medical Sources not listed in paragraph (a) of this section (for example, *nurse-practitioners*, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists).

20 C.F.R. § 404.1513(d) (emphasis added).

Similarly, when considering the opinions of non-acceptable medical sources, the ALJ's opinion should:

> . . . reflect the consideration of [these] opinions . . . Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," . . . when such opinions may have an effect on the outcome of the case.

SSR 06-03p.

In the case at bar, the ALJ discussed Nurse Angela Jackson's Medical Source Statement and the weight accorded to it as follows:

> Angela Jackson, APN, FNP, of the Matthew Walker Comprehensive Health Center wrote a letter in April 2011, stating that the claimant's degenerative disc disease prevented her from performing certain job duties, including standing, walking, pushing and pulling for any continuous timeframe. Exhibit 12F.
>
> . . .
>
> As a threshold matter, NPs, counselors, and social workers are not "acceptable medical sources" under the Social Security Act for authoritative independent opinions relating to diagnoses and limitations. They are "other sources" whose opinions must be considered, but that cannot be given preeminence over well-supported contrary opinions from acceptable medical sources, such as licensed physicians, psychiatrists and psychologists. 20 CFR 404.1513 and 416.913.
>
> . . .
>
> The Administrative Law Judge has considered all the evidence in

20

the file.  Examining physician, Dr. Watson, determined the
claimant can perform sedentary work, while the treating nurse
practitioner [Angela Jackson] stated the claimant cannot perform
certain job related duties requiring any standing, walking, pushing,
and pulling for any continuous timeframe.  The Administrative
Law Judge accepts both of these opinions and gives then
significant weight as they are consistent with the record as a
whole. . . .

TR 16, 18, 19, *citing* TR 278.

The ALJ also discussed Nurse Carrie Brensike's Medical Source Statement as follows:

The claimant was assigned a Global Assessment of Functioning
(GAF) Scale Score of only 50 after the initial evaluation with the
Mental Health Cooperative.  The DSM-IV-TR (2000, p. 34)
explains that GAF ratings in the range of 50 and below indicate at
least "serious symptoms" of mental impairment that would
typically preclude work.  The mental health records also contain a
clinically related group (CRG) summary assessment, also
completed after the intake evaluation.  Narrative ratings in the
CRG are assigned in the following general functional areas:
activities of daily living; interpersonal/social functioning;
concentration, persistence and pace; and adaptation.  These general
areas are numerically rated as follows: 1-extreme symptoms/
limitations; 2-marked symptoms/limitations, 3- moderate
symptoms/limitations; 4-mild symptoms/limitations; and 5- no
symptoms/limitations.  Even though the claimant was assigned a
"3" in every functional area (indicating only moderate limitations),
her assigned GAF rating was only 50.

In addition, the file contains a March 2011 medical source
statement from Carrie Brensike, one of the claimant's treating
psychiatric nurse practitioners (APN).  This assessment was also
signed by F. Drummond, M.D.  This medical source statement
indicated the claimant has moderate limitations in understanding,
remembering and carrying out simple instructions; making
judgments on simple work-related decisions; in social functioning;
and in responding appropriately to usual work situation and routine
workplace changes; and marked limitations in understanding,
remembering and carrying out complex instructions; and making
judgments on complex work-related decisions.  Exhibit 10F.

Although this assessment seems to be consistent with the moderate

21

limitations in the CRG, these moderate limitations are also contradictory to the low GAF rating of only 50.

As a threshold matter, NPs, counselors, and social workers are not "acceptable medical sources" under the Social Security Act for authoritative independent opinions relating to diagnoses and limitations. They are "other sources" whose opinions must be considered, but that cannot be given preeminence over well-supported contrary opinions from acceptable medical sources, such as licenced physicians, psychiatrists and psychologists. 20 CFR 404.1514 and 416.913.

Additionally, GAF scores are not an assessment of the claimant's mental status and/or limitations on her mental status. They are used to track the clinical progress of an individual in global terms. (See also DSM-IV).

Reviewing the mental health records establishes that there is little if any rationally discernible pattern or connection between the limitations assessed and the GAF rating. Consequently, the GAF rating of 50 is not accorded significant weight, even if it came from an acceptable medical source.

TR 17-18, *citing* TR 273-75.

Contrary to Plaintiff's assertion that the ALJ improperly discounted Nurse Jackson's MSS because he did not accord it "great weight," as can be seen in the quoted passages above, the ALJ actually accorded it "significant weight" and explicitly discussed his reasoning for so doing. TR 16, 19, *citing* TR 278. Moreover, Nurse Jackson's opinion that Plaintiff could not engage in standing, walking, pushing, or pulling for a continuous time frame is consistent with the ALJ's determination that Plaintiff retained the residual functional capacity to perform sedentary work with a sit/stand option. TR 14, 278. The ALJ properly considered Nurse Jackson's MSS, articulated the weight accorded to that MSS and the reasons therefore, and the weight accorded was supported by substantial evidence. Accordingly, Plaintiff's contention on this point fails.

22

Regarding Nurse Brensike's opinion, for the reasons articulated by the ALJ in his decision, the ALJ appropriately declined to accord Nurse Brensike's opined GAF score of 50 significant weight. TR 18. As an initial matter, GAF scores are not determinative of disability for Social Security purposes. In fact, the Social Security Administration has declined to endorse the GAF scale for "use in the Social Security and SSI disability programs," and has indicated that GAF scores have no "direct correlation to the severity requirements in [the] mental disorders listings." *See* Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746-01 (August 21, 2000). Although "the GAF is a test used by mental health practitioners with respect to planning treatment and tracking the clinical progress of an individual in global terms, the ALJ is not bound to consider its results at the exclusion of other medically reliable evidence." *Alvarez v. Barhart*, 2002 WL 31466411, at *8 (W.D.Tex. October 2, 2002). Nor is a GAF score determinative of an individual's RFC assessment. *Id.* ("A GAF score is not a rating typically relied upon with respect to assessing an individual's RFC under the Act."); *see also Howard v. Commissioner*, 276 F.3d 235, 241 (6th Cir. 2002)(GAF score is not essential in assessing RFC).

Additionally, the ALJ did not accord Nurse Brensike's opinion significant weight because it was unsupported by, and conflicted with, other evidence in the record which indicated that Plaintiff had "no more than moderate limitations in functioning." TR 19. As the ALJ observed, "there is little if any rationally discernible pattern or connection between the limitations assessed and the GAF rating." TR 18. Plaintiff's argument that the ALJ improperly minimized her mental health problems because he did not properly weigh Nurse Brensike's Medical Source Statement fails.

23

### 3. ALJ's Consideration of Plaintiff's Impairments

Plaintiff contends that the ALJ did not consider all of her severe impairments. Docket No. 14-1 at 6. Specifically, Plaintiff argues that the ALJ did not consider her episodic paresthesias, her obesity as it relates to her ability to work, or her bipolar disorder. *Id.*

Defendant responds that the ALJ properly considered and evaluated all of Plaintiff's alleged impairments, including, *inter alia*, her degenerative disc disease, episodic paresthesias, obesity, depression, and bipolar disorder. Docket No. 19 at 14-17.

Regarding Plaintiff's episodic paresthesias, the ALJ discussed the physician's report from her March 5, 2010 emergency room visit (recounted *supra*, in Plaintiff's first statement of error). TR 15. The emergency room physician's report states in pertinent part:

> ASSESSMENT:
> I have a 46- year-old female with complaints of atypical chest pain and shortness of breath with exertion for the last two years as well as what sounds like some tingling in her left leg when she sits on the toilet for a prolonged period of time and followed by what sound [*sic*] as a pulsation of the femoral artery. The patient has no acute changes on her physical exam. Her cardiac workup here in the emergency room is unremarkable.
>
> PLAN:
> I do feel that the patient is experiencing some atypical symptoms. There is no evidence of an acute coronary event at this time or acute pulmonary abnormality. She has no evidence for an infectious process. Her vital signs are stable. Other than possibly adding aspirin to her current regimen, I would not add any more medications to the patient's regimen. . . . Certainly, if her symptoms intensify or she has any new symptoms, she is more than welcome to return to the emergency room, but I certainly reassured the patient that her workup here in the emergency room was normal.
>
> FINAL IMPRESSION:
> 1. Atypical chest pain.
> 2. Episodic paresthesias left leg x2 years.

24

TR 267.

As was demonstrated in the discussion of Plaintiff's first statement of error, above, the ALJ was aware of, and considered, Plaintiff's March 2010 visit to the emergency room and her complaints therein. Accordingly, the ALJ was aware of, and considered, Plaintiff's complaints of episodic paresthesias. Plaintiff's assertion to the contrary is unavailing.

With regard to obesity, expressly noting that Plaintiff weighed 258 pounds and stood 65 inches tall (TR 15), the ALJ discussed Plaintiff's medical records, which demonstrated that, although Plaintiff was obese, her physical functioning was essentially normal (TR 15-16). After considering Plaintiff's medical records and reported daily activities, the ALJ ultimately found that Plaintiff's obesity was a severe impairment. TR 13. Although Plaintiff contends that the ALJ did not consider how her obesity impacted her ability to work, the ALJ specifically addressed this as follows:

> . . . Particular attention was given to Social Security Obesity Ruling 02-1p. Although the claimant has had a long history of obesity, her overweight condition has not resulted in any co-morbidities such as diabetes mellitus or coronary artery disease. Furthermore, her body habitus did not prevent her from working as [a] dump truck driver.

TR 13.

As can be seen, the ALJ specifically found that Plaintiff's obesity had not led to related health problems and had not prevented her from working in the past. Plaintiff's argument that the ALJ did not consider how her obesity impacted her ability to work fails.

With respect to Plaintiff's argument that the ALJ did not properly consider her bipolar disorder, the ALJ discussed in detail Plaintiff's mental health records, as recounted in the previous statements of error above. *See* TR 17-19. As has also been noted, the ALJ properly

discussed why he did not find Plaintiff's GAF scores to be compelling evidence of a psychological disability. TR 18. Plaintiff's argument that the ALJ did not properly consider her bipolar disorder fails.

### 4. Residual Functional Capacity ("RFC")

Plaintiff maintains that the ALJ's RFC determination was not supported by the treatment records and that the ALJ did not consider the entirety of the evidence when rendering Plaintiff's RFC. Docket No. 14-1 at 8-9. Specifically, Plaintiff argues that, when determining her functional limitations, the ALJ did not properly consider her episodic paresthesias and bipolar II disorder. *Id.* Plaintiff additionally argues that her testimony indicates limitations greater than those of the assigned RFC. *Id.*

Defendant responds that the ALJ properly considered Plaintiff's mental and physical impairments when making his RFC determination, and therefore, that the ALJ's determination should stand. Docket No. 19. at 14-17.

"Residual Functional Capacity" is defined as the "maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs." 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(c). With regard to the evaluation of physical abilities in determining a claimant's Residual Functional Capacity, the Regulations state:

> When we assess your physical abilities, we first assess the nature and extent of your physical limitations and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce your ability to do past work and other work.

26

20 C.F.R. § 404.1545(b).

As has been discussed in the previous statement of error, the ALJ properly considered Plaintiff's episodic paresthesias and bipolar disorder. For the reasons discussed above, Plaintiff's argument that the ALJ failed to consider these impairments when determining her RFC is unavailing.

The ALJ, after evaluating all of the objective medical evidence of record and Plaintiff's reported level of activity, determined that Plaintiff retained the RFC to perform limited sedentary work. TR 14. Specifically, the ALJ stated:

> After consideration of the entire record, the Administrative Law Judge finds that the claimant has the residual functional capacity to perform sedentary work limited as follows: to lift and carry 10 pounds; with the option to stand, walk and sit at will; and occasional ability to climb, balance, stoop, crouch, kneel and crawl. Additionally, the claimant is able to understand, remember and carry out short and simple instructions; make judgments on simple work-related decisions; and have occasional contact with the public.

*Id.*

Plaintiff's argument that her own testimony indicates that she has a more limited RFC than was assigned by the ALJ does not constitute grounds for reversal or remand because the ALJ did not find Plaintiff's testimony to be entirely credible. TR 19. As discussed above, the ALJ articulated several reasons for questioning the veracity of Plaintiff's testimony, and he was therefore not bound to accept her claims. TR 19. The ALJ properly evaluated the evidence when reaching his RFC determination, and the Regulations do not require more.

Moreover, the ALJ's determination that Plaintiff retained the RFC to perform sedentary

work with limitations is supported by the testimony of VE, Lisa Courtney, who testified that there are jobs such as inspector, table worker, and auto machine tender that the Plaintiff could perform that exist in sufficient quantities in the local and national economies.  TR 20, 45-49.

The ALJ's RFC determination was based on, and supported by, substantial evidence. Because there is substantial evidence in the record to support the ALJ's RFC determination, the ALJ's determination must stand.

## **5.  Conflict Between Vocational Expert Testimony and Dictionary of Occupational Titles**

Plaintiff asserts that there is a conflict between the jobs identified by the vocational expert as being appropriate for the Plaintiff's RFC level, and the classification of those jobs in the Dictionary of Occupational Titles.  Docket No. 14-1 at 12-13.  Specifically, Plaintiff maintains that since the VE considered jobs with a sit/stand/walk option, and the DOT does not recognize this option, it is unclear where the VE obtained the list of jobs she presented at the hearing. *Id.* at 13. Plaintiff further argues that because the ALJ never addressed or resolved this inconsistency, he erred in relying on the VE's testimony.  *Id.*

Defendant responds that since the ALJ specifically instructed the VE to identify any conflicts between her testimony and the DOT and none were identified, the ALJ was justified in relying on the VE's testimony.  Docket No. 19 at 17.  Defendant further contends that the VE's testimony was not inconsistent with the DOT because the DOT does not prohibit the consideration of a sit/stand option, but is merely silent regarding such a limitation.  *Id.* at 17-18.

A VE's testimony can establish that there are a significant number of jobs available to a claimant even if the claimant has additional limitations that are not listed in the DOT.  *See e.g.*, *McCormick v. Secretary of H.H.S.*, 861 F.2d 998 (6th Cir. 1988).  While an ALJ may not rely

28

strictly on the grid to determine the availability of jobs when a claimant has additional

limitations not included in the DOT, the VE can testify that there are a subset of those jobs listed

in the DOT that the claimant could perform with additional limitations. *Id.*

In the case at bar, the ALJ's hypothetical question to the VE that included the sit/stand at

will option resulted in the following exchange:[4]

> Q    . . . Assume a person of the claimant's age, educational and
> work experience. Assume I find such a person is able to
> perform sedentary work with occasional postural activities,
> has the [INAUDIBLE] climbing, bouncing, stooping,
> crouching, kneeling, crawling. *Assume the person is
> required to exercise the sit, stand option at will*, assume the
> person's able to understand, remember and carry out short
> and simple instructions and make judgments on simple
> work related decisions, assume jobs allowing occasional
> interaction with the public. Past work would not be
> available?
>
> A    Correct.
>
> Q    What unskilled sedentary work would be available for such
> a person and at what numbers in the Tennessee and
> national economies?
>
> A    Yes, there would be a base of jobs that sit, stand option
> leaves about half of the unskilled sedentary type jobs.
> Let's go with inspector. This particular title in that
> occupational base of testers, inspectors and examiners is
> called a dowel, D-O-W-E-L, inspector and that DOT code
> is 669.687-014. It's sedentary. The SVP is 2. It's
> unskilled, about 1,600 for Tennessee and about 35,000 for
> the United States. Let's go with the table worker, 739.687-

---

[4] The ALJ proffered several hypothetical questions to the VE, in various incarnations.
Because the other hypothetical questions do not directly include the sit/stand at will option, they
will not be recounted here. *See* TR 47-49 for remaining hypothetical questions.

Case 3:12-cv-01059   Document 22   Filed 08/22/13   Page 29 of 31 PageID #: 411

182. It's sedentary in exertion, the SVP is 2, it's unskilled about 1,400 for Tennessee, and about 30,000 for the United States and I'll go with an automatic machine tender. There's various different ones. Let's go with this automatic machine operator. When I say automatic these are, it's sedentary, they're usually fully automatic, 690.685-194, it's sedentary, SVP is 2. Now this has a sit, stand option because in between cycles they can get up and down. They're just minding the controls, about 1,200 for Tennessee and about at least 30,000 for the United States.

TR 45-47.

As is evidenced above, the VE limited the jobs she identified in response to this hypothetical question to those that included a sit/stand option, a subset of the sedentary work listed in the DOT. *Id.* The VE testified, and the ALJ specifically found, that "[p]ursuant to SSR 00-4p, the vocational expert's testimony is consistent with the Dictionary of Occupational Titles." TR 20. As the VE's testimony took into account Plaintiff's additional limitations, the ALJ was justified in relying on this testimony in determining that there are other jobs that Plaintiff could perform. Plaintiff's argument fails.

## IV. RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any

30

response to said objections.  Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.


_____
E. CLIFTON KNOWLES
United States Magistrate Judge

Case 3:12-cv-01059   Document 22   Filed 08/22/13   Page 31 of 31 PageID #: 413